The next case today is Myothant v. Karyopharm Therapeutics Inc. et al. Appeal number 21-1657. Attorney Apton, please introduce yourself for the record and proceed with your argument. Thank you. Adam Apton. I'm leaving Korsinsky for appellant Myothant. With the court's permission, I'd like to reserve three minutes for rebuttal. Please. Thank you. Section 10b of the Exchange Act and SEC rule 10b-5 are intended to provide investors with a right of recovery for those that have lost money because of fraud. A key element in those causes of action is that of scienter. This court most recently addressed that element in the Carbonite decision, but Ariad Pharmaceuticals from 2016 presents facts that are very similar to the ones at bar and, in fact, illustrates Plaintiff's arguments in this case. In that case, in Ariad, the defendants told the public that their most prevalent adverse event was pancreatitis when, in fact, they knew that 8% of their trial participants had sustained serious cardiovascular events. In our case, we have something quite similar. We have the defendants representing that Selenexor's trial data from the STORM trial, which was the pivotal trial for Selenexor's NDA, presented a predictable and manageable safety profile and showed adverse events of nausea, vomiting, fatigue, and loss of appetite. In reality, we now know that 100% of the trial participants sustained an adverse event, 60% of which were serious adverse events, 25% had to discontinue treatment due to Selenexor's toxicity, and there were 18 on-study deaths. If the district court were to have followed Ariad, we believe that it would have concluded that plaintiffs had adequately alleged scienter. There were two critical questions in Ariad. One was when the adverse event occurred, and two, when defendants knew about it. Excuse me. Here, we know that the first question was answered in plaintiffs' favor, but when did the adverse event occur? Well, the April 30 and May 1 misrepresentations at issue here reported the results of the trial data for the STORM trial. So, the STORM trial was complete. The adverse events had already occurred. We also know that defendants were aware of them because of plaintiffs' former employee allegations, as well as some other allegations. First, we know in August of 2016, FE1, who was Carrier Farms' global head of pharmacovigilance, had a direct confrontation with defendant Kaufman about the misreporting or unreporting of 353 adverse events. Present at that meeting was defendant Shackham, as well as Carrier Farms' director of operations and director of medical safety. Were those adverse events in the STORM trial? Yes. Okay. And others, but also included in the STORM trial, Your Honor. Do we know how many of the adverse events that were identified at that meeting were adverse events in the STORM trial? I do not know, but I do know that... Is there anything in the allegations that suggests how many of them were? No, Your Honor. No. It was all trials relating to Salinexor, including those in the STORM trial, though. That is alleged. Those paragraphs are 229... But just to be clear, the amount of adverse events that you're identifying that makes the statement false and misleading, what in the allegations indicates, what's your theory then, of knowledge of the level of adverse events that would be necessary in order for the statement that you're challenging to be false and misleading? Do you follow what I'm saying? In other words, you've got a knowledge point, which I think you're right to focus on as being important. You've got evidence of a mismatch between the description and then what the trial showed in terms of adverse events. And then you've got evidence of adverse events of the combined trials having been noticed to the officials in question. But we don't know, if I'm buying from the allegations, how much of the adverse events in the STORM trial were made clear to the officials in question. So, what are we supposed to do with respect to that gap and trying to figure out whether they had the kind of knowledge of the inaccuracy of the statement that would suffice under Erriot to make it possible for us to reach the conclusion that the allegations of scienter was made? Your Honor, it seems as if your question goes to falsity. No, no, because I don't dispute that ultimately we know, or maybe I'm wrong, I thought we ultimately know the amount of adverse events in the STORM trial such that it makes the statement false. Yeah, I heard you to be saying that the allegations do not suggest that that sum total of adverse events, which is being used to show the statement was false, was all known to the high officials at the company at the time of the meeting you just described, where adverse events were not known to them. Your Honor, that meeting is used to show the beginnings of this intent, this intent to conceal the true safety data from the public. I guess what I'm asking is what in the allegations shows knowledge of the amount of adverse events in the STORM trial was held by the high officials who made the statement, which we now know to be misleading given what evidence comes out about how many adverse events in the STORM trial. What do we know about their knowledge of the amount of adverse events in the STORM trial at the time they made the statement? Your Honor, we know that defendants Koffman and Shackham were very closely involved in the STORM trial. They attended the type B meeting, the mid-cycle meeting. This was also a key drug for the company. We include those allegations in our complaint at paragraphs 263 to 265. Their presence in those meetings, defendant Shackham's role as chief science officer, defendant Koffman as chief executive officer, they are closely involved with those studies and have intimate knowledge with the data, but so much so that they were the ones personally pressuring and threatening former employees, one, two, to falsify that adverse data. So admittedly, of the initial 353 adverse events discussed at the meeting between Koffman and FB1, I cannot say with certainty how many related specifically to the STORM trial, but as we move forward in the timeline, we see again and again defendants Koffman and defendant Shackham acting with that intent to suppress safety information that ultimately leads to the discrepancy that Judge Gorton identified in the April 30 and May 1 public statements. But those statements were that the Selinexor drug and the STORM trial data presented when when is the trial completed and all of the adverse events that are ultimately being identified to show the false and misleading nature of the statement. That's all completed relative to the statement being issued. Yes, absolutely. So in paragraph 23, we allege when the study was completed by and it is before the April 30 and May 1 statement. How much before? Your honor, I do not know exactly how much before, but so when when is the first? What is what is in the allegations? With respect to when the number of adverse events in the STORM trial is known to anyone? It would be prior to the April 30 and May 1 statement. I know, but do we have the date and when that gets known? In other words, is it a rolling thing where there's more and more adverse events? They all are clustered towards the end. They occurred throughout. Do we have anything about that with respect to it? No, your honor, I don't know exactly when the adverse events occurred except to the extent that they occurred before the presentation. With respect to the last thing, with respect to the two officials whose knowledge of the adverse events is key to your claim of scienter, aside from that initial meeting that you reference, is there anything but what are the other pieces of evidence you're relying on that would show they actually would have known the number of adverse events that had occurred being, you know, very large at the time they made the statement? Sure. We have the initial meeting with FE1 in August of 16. After that emotional meeting, FE1 quits. Defendant Shackham, Kauffman, as well as Chief Development Officer and VP of Good Clinical Practices start pressuring FE2, that's also in August of 16, to falsify the adverse event reports. We have March of 17 when the FDA issues the clinical hold in connection with Carrier Pharm's failure to report safety information. We then have in mid and late 2018 testimony or allegations from FE3 and FE4 saying that they too were pressured, excuse me, and importantly FE4 who was responding to requests for information from the FDA says that it was clear, crystal clear, or exact words, that information was omitted, safety information was omitted from the NDA for Sonexor. Then finally, fast forward to... When you say pressured by whom, what's the allegation? Oh, FE2 was threatened by FE3. In February of 2019, we have the FDA's ODAC report which corroborates plaintiff's allegations of intent, specifically citing Carrier Pharm for misclassifying on-study deaths as being unrelated to treatment when in fact the evidence didn't support that. So I take your honor's point. It's well-founded that we don't know exactly how many adverse events occurred specifically when in connection with or in advance of the April 30 and May 1st false statements, but under Ariadne we do know that these adverse events occurred prior to those misrepresentations because the study was completed at that point in time, and we also know that intent had formed by those misrepresentations based on the conversations with FE1, FE2, the FDA clinical hold, and we do know that that intent continued through the document. I would add that when Judge Gorton below considered our inference of Sander relative to defendants, which was that defendants believed additional disclosure was unnecessary, it was based on a misreading of the record. Two important points need to be emphasized. One, Judge Gorton started on the basis or with the premise that everyone knew Sonexor was intended for a very ill patient population. That does not excuse defendants from speaking accurately or completely under the Tudor-Perini case. In fact, the way we see it is that given the risk-benefit analysis to be performed by the FDA, adverse events to an already frail population would be scrutinized even more so than normal. Our point is illustrated by the RBC Capital Analyst Report. Judge Gorton was persuaded by one particular line in this analyst report that the market considered information about the safety profile in context with that ill patient population, but the analyst report when read in context, it shows actually when read in just one sentence before and sentence after, it shows that this analyst was just as deceived as plaintiffs and expected safety events. He notes increased fatigue and actually concludes that Sonexor would move up in the treatment paradigm based on the safety profile. We know that that was not true because the ODAC report ultimately concluded the information that was omitted about the safety profile. I want you to, if you would, and we of course read your brief, but opposing counsel and the court referenced Dearborn Heights for the proposition that the key question with respect to Sienta is, quote, not whether defendants had knowledge of certain undisclosed facts, but rather whether defendants knew or should have known that their failure to disclose those facts presented a danger of misleading buyers or sellers. I think I heard you to say that the district court, you know, got it wrong in that it was perhaps not universally known the extent to which this drug was extremely toxic. And if that knowledge had existed, that knowledge, you know, would have impacted the price of the stock. Is that a fair understanding? Yes, Your Honor. Thank you for that question. Yes, I would say so. And this is why we argued in our brief that the district court contradicted itself to a certain extent. It recognized how important the omitted safety information was, but then effectively concluded that, notwithstanding, investors would not have reacted differently had it been disclosed. And what do you make of the, one last question, of the fact that, as I understand it, ultimately the FDA approved the drug, right? It approved the drug. With the determination that it is extremely toxic, is that correct? Well, Your Honor, so that's a point that I wanted to make in rebuttal, and so thank you for bringing me it up. Defendants at the lease referenced in their brief several times that the drug was approved. It was approved, yes, six months after the end of the class period, based on very different clinical data, the Boston study data, and for an indication that was quite different than what it initially applied for. A much smaller subset of patients that really, as the FDA put it, had no other treatment available, period. So, yes, it was a drug with the same name that ultimately got approved, but under very different circumstances. Thank you. Let me just ask you one question. Judge Gorton, in his opinion, regarding the storm-related disclosures, and I'll read it, it's very brief, he says, accordingly, at this stage, the court concludes that defendant storm-related disclosures were arguably incomplete for failing fully to reveal the drug's toxicity. How does that help your case, if at all, from, you know, the 12B6 dismissal? Is that inconsistent with the result? I'm sorry, Judge, I'm not sure I quite understand the question. Well, Judge Gorton made the comment, in his opinion, this is specifically page 21, that the disclosures were arguably incomplete regarding the storm-related ones, for failing to fully reveal the drug's toxicity, and my question to you is, does that help you, and is that statement inconsistent with the ultimate dismissal of all your claims? So, thank you, Judge. Yes, I mean, that statement is very important. It's what gives us the basis, what gives us the opportunity to focus only on Scienter today, because that decision from Judge Gorton's opinion says, okay, plaintiffs have plausibly alleged the element of falsity, and this is, it goes to what I touched upon earlier. It's why we allege, or why we argue presently, that Judge Gorton contradicted himself. I understand, based on this court's case law, going back, that if a statement is truly immaterial, even if technically false, it still may not be suggestive of Scienter. It's more of defendants neglected to mention something than intentionally hid it from investors. Here, though, and based on the that the information omitted about Selenoxer's toxicity was extremely material and important enough to establish falsity for the purposes of the pleading stage. We know that the, again, from our former employee allegations, as well as the FDA action, we have a, at least for pleading purposes, we've established intent on the part of defendants to conceal that information of So it, academically, perhaps we can consider whether this is an intent to mislead or whether it's recklessness, but we would submit it's a difference without distinction in this instance. Bottom line is defendants acted in a way that was clearly unreasonable. It deviated from normal standards of care, and it created a reckless risk of misleading investors. Thank you. Okay. Thank you, counsel. And just so Apelli knows, I'm going to ask that same question, so you can address it at any point, and that way I'll save time and not interrupt. Thank you. Thank you. At this time, would Attorney Apton please mute his audio and video? And Attorney Bongiorno, please introduce yourself on the record to begin. Good morning. Mike Bongiorno from WilmerHale on behalf of the defendants. I'd like to start by that the appellant mentioned in his argument, including, of course, Judge Gelty's question. Let me start by saying that the appellant's argument commenced with a discussion of a supposed misstatement that is not part of this appeal. The appellant was analyzing the Ariad case and said that in Ariad, you know, the company talked about, I don't know how much detail went into, but the company talked about a 5% adverse event scenario with regard to pancreatitis versus cardiovascular events that occurred more often. And he compared that to CarioPharm's statements here about nausea, fatigue, and loss of appetite relative to more serious adverse events. There is no statement on appeal in this case regarding nausea, fatigue, and loss of appetite. There are only two statements that appellant has raised on this appeal, one of them about a predictable and manageable tolerability profile and the other one characterizing the storm trial as a success and an important milestone. So, this notion that CarioPharm said something, you know, I thought the contention was that the representation of the success when combined with the description of what you might call adverse events that are not as significant as the ones that were not disclosed is what made it false and misleading. I don't think so, your honor. I think that may be part of the theory of the case initially, but Judge Gordon dismissed every statement. Every statement that we made either on the grounds that they were not material or weren't misleading or in two instances, two statements, the manageability and tolerability and the success and important milestone statements. Those he didn't dismiss on scientific grounds and those are what's being appealed. Now, no doubt, your honor, the issue is an omission where the omitted information, but it's not whether or not a statement about fatigue and nausea is false. No, I think he wasn't. Maybe I didn't think there was a dispute about the point you're disputing. I thought the suggestion that was being made is that the failure to disclose the number of adverse events that occurred is what makes the statements that are in question false and misleading. No doubt, your honor, no doubt, but his statement about ARIA that we made, we made statement A and the opposite was. No, I understand. I think what he was using ARIA for, which should be good if you could get to, is the point about knowledge, which is that it's one thing when there's a false and misleading statement that doesn't show a scienter just in and of itself, but when there's a false and misleading statement by people who had knowledge of the information that renders the statement, whether it's a direct inconsistency or an omission, false and misleading, that can produce the basis for finding scienter. Certainly, your honor, although I would say in response to that, in ARIA, they had a statement that was directly contradicted by knowledge. So in ARIA, they said the most common adverse event was pancreatitis at 5% when that wasn't true. Did they have the knowledge at the time the statement was made that is the knowledge that now we have that enables us to say the statement was false and misleading? Well, that's understood, your honor. What's the answer to that? What's your answer to that question? The answer to that question is it's not in the pleadings and they weren't able to cite to the pleadings the specific information about which you were asking, because there are actually three trials here and four if you count Boston, but there's SOPRA, there's Storm 1, and there's Storm 2. And the data that he was talking about during his argument had to do with very early data and data from the SOPRA trial and data from the initial Storm trial, not the data that's the subject of the press release that we're talking about here, because the data that we're talking about here is the Storm 2B trial. And you heard him say at the end of his argument that ODAC, the panel that the FDA convenes to advise them on what to do with drug applications, that ODAC denied approval of the drug. That's just not true. ODAC recommended in an eight to five vote to delay approval until they could see additional data. They didn't. Help me out. You're not challenging, at least for purposes of our scienter discussion, that there is enough information now known about the Storm 2 trial such that the representation in question could be found false and misleading. For purposes of the scienter discussion, you're accepting that as arguendo, correct? Well, we would accept that for the scienter discussion. Yes. So, before you, how much adverse event information needs there to be in order for that premise to be true? In other words, what is the amount of information of the adverse events that occurred in that trial that you're accepting exists to render that statement false and misleading? Because without knowing that, it's hard to then figure out, okay, did they have that amount of knowledge? Sure. And I'm not smart enough to answer that question, Your Honor. I don't know when a threshold is passed between what would or would not be considered misleading. I mean, if you're willing to get to the scienter question by accepting it's false and misleading, I mean, is it just the amount of information that they had back in 2016? You seem to be saying, no, that's not enough. So, at some point, there is enough information. Can we tell from Judge Gorton's opinion how much knowledge of adverse events he had in mind that made it false and misleading? I'm only accepting it for the purposes of discussing the scienter point. In our brief and here today, if you're interested, I'm certainly more than willing to argue that those statements weren't false and misleading in the first instance under the Rewalk case because they're much too general for that. That's a different point. We know ultimately how many adverse events occurred. Yes. And we know that that number of adverse events occurred sometime prior to the statement question being made, correct? Yes. Okay. So, we know that at least that number of statements, that number of adverse events, suffices to make it a false and misleading statement in Judge Gorton's eyes. And for purposes of the scienter discussion, you're not challenging that. Correct. Okay. So, back me up then. You tell me the amount of information they had of adverse events back at that 2016 meeting is not enough. That meeting alone doesn't tell you they had the kind of knowledge that is the knowledge that we know at the end is being used to say it was a false and misleading statement. They then say, yeah, but we know in 2016, they were trying to from being known. And then they're monitoring and constantly doing similar types of things throughout. So, in that type of setting in which the amount of information of adverse events that would suffice to make the ultimate statement made false and misleading was knowable prior to the statement being made. And the statement was made by people who seemed interested in, if the making it not known. And they're high up in the company and monitoring an important trial. Why isn't it fair to infer, at least as a reasonable inference, as strong as the opposite? That at the time they made that statement, they knew how problematic, how many adverse events were there. And we're not disclosing it to investors, just like they've been keen on not disclosing adverse events all the way through. What's wrong with that account? Because that's what I take it. Your opponent's story is you're challenging that. That may be their story, your honor. I think there are a number of challenges to it. I would start at the other end. I would start with the Cienter notion, which is, there are a few things about it that I think are problematic. One is that those were the allegations about the arguments going back to 2016 were arguments about what went into the drug application to the FDA and whether or not to characterize events as drug-related or not drug-related. Those are scientific disagreements. People have where we're sitting right now, a couple of miles from Kendall Square. That happens all day, every day, with scientists and folks working on clinical trials. The notion that they were concealing things from the FDA or not concealing things from the FDA— Five minutes remaining. Five minutes. Just to isolate, though, with respect to the knowledge about the number of adverse events, their story is that given the interest these two officers had in this topic and their monitoring of it over time, it is a reasonable inference that they would have known of the number of adverse events at the time they were making the statement. Are you contesting that or not? No, your honor. No. These folks were involved. These folks were monitoring. There are a number of questions about what that means, though. Okay. Your focus of your objection is that though they knew that number of adverse events and even though that number were conceding or assuming suffices to make the statement false and misleading, they still didn't have the intent, even though they had that knowledge and made the statements they made. Absolutely. Even if you assume it, your honor, I don't want to spend my whole time battling over whether or not they assumed it because I understand the court's position on it and I accept it. But I'll go to Judge Galpi's question because I think it informs your question, Judge Barron, which is even assuming they knew it, what does that mean for this case? And Judge Gorton came out exactly right on that point because Judge Galpi quoted him accurately before, arguably misleading. That doesn't mean obviously misleading. That doesn't mean obviously reckless. Arguably misleading is a close call. And Sarepta says the level of materiality, marginal materiality, undercut an inference of Sarepta. And here, what we have, I think, is marginal materiality at best because the statement, again, is predictable and manageable tolerability profile, which turned out to be true. Five of the 13 ODAC members voted to approve the drug on the basis of this data. The label that was given to the drug when it was approved and opposing counsel says, yeah, the drug had the same name. It's not a drug that had the same name. It's the same drug. And if you look at the label, which is at the appendix on starting on page 519, it's the storm data that's on the label. So it's not as though the FDA forgot about the storm data, waited for a whole bunch of other data and said, OK, we can ignore the adverse events from the storm data. Let's look at the Boston data now. That's better. Now we can approve it. That's not what happened. The plaintiff knows that's not what happened because that's what's in the record. The drug was approved. It was approved four and a half months after the end of the class period. It was approved with the label that relies on the storm data. It was proved after a delay, not a denial, a delay in which five of the 13 ODAC members voted for immediate approval, not delay, and eight voted for delay. How is that a intentionally fraudulent statement that the defendants knew when they were saying what they said, manageable and tolerable? It was manageable and tolerable. It turned out to be manageable and tolerable. I'm not asking you to assume truth by hindsight. I'm asking you to understand what to take an inference under TELLABS as to what they reasonably could have understood at the time they made that statement. And with lots and lots of risk factors out there, not generic risk factors, not maybe someday there might be an adverse event and that might cause the FDA to get upset. No, the risk factors, some of which were stated. Does the statement that then goes on to list what, at least to me, sound like relatively minor side effects undermine the point that you're making? No, your honor, because the adverse of it, everybody knows, and plaintiffs try to turn this on its head, but everybody knows this is a cancer drug for folks who have suffered for a long time, pentorefractory patients, a median of eight other combinations of treatments. Very, very sick people, very short, sadly, very short lifespan. And if you look at the label, the label lists all of those things, the nausea, the fatigue and everything in them. So the adverse events, including serious adverse events, which means, you know, death, hospitalization, etc. All of that was discussed in the risk factors. It wasn't discussed generically. Can I follow up, counsel, in that you seem to be arguing that the investors were not misled in part because of the nature of the drug and the trial participants. Is there any point at which the severity of the side effects necessitates disclosure to investors, despite the drug at issue being a last resort treatment? Well, your honor, I understand the question, I appreciate it. What I'm focusing on is scienter, of course, so that the decision that Judge Gordon made and that this court seems inclined to agree with is that the statements, at least on their face, are arguably misleading. So conceding that point for the purposes of this argument and focusing on scienter, the question is, you know, the question then becomes not should they have disclosed the adverse events or should they have not disclosed the adverse events, but it's time. But should they have? Thank you. May I finish? Yeah, you may. But should the defendants have known that the statements that they made were false and misleading when they made them, given the context and the context that I go back to is their disclosure of as a result of these adverse events, not some theoretical ones, but these. So just taking the framing you just gave, what's your answer to Judge Katzmann's question? Is there any set of side effects, a seriousness that would yield an affirmative answer to the questions you just posed, which is should they have known that it would be significant enough? I think that if the record supported the notion that they knew that the number of adverse events was so high that this drug could not be approved, that the risk profile was too high for this drug to get approved, then perhaps you could say that they should have known that the statement they made about manageable and predictable would have been knowingly misleading. But not only is there nothing in the record to support the notion that they knew that, that's not what happened. The record could never be approved because of the number of adverse events. If the drug was approved four and a half months later and the label relies on the storm data. And just last question, suppose they knew that it would make approval go from say 100% likelihood to 60% likelihood, is that something that they then have to inform investors about? I think that's probably cutting too thinly, your honor, to even be able to predict how that would turn out. Of course, if the FDA said that to them, then I think that would be disclosable. If the FDA said we were ready to approve this drug or at least accept an ODAC recommendation to approve this drug until we saw this data, now we're not. That would be disclosable. So I think the answer to your question is, if they had actual knowledge that the possibility of approval was reduced by 40% and they knew that, and they turned around and said, whatever they said, the Rewalk case says that the stuff they say about this is not material. You're not calling a product a breakthrough product, et cetera. They set an important milestone and significant step. Maybe saying that something's an important milestone when you just found out there's a 40% chance of approval, I could see something like that. But here it's far too subjective and scientifically complex to be able to put numbers like that on unless they come from the FDA. Let me ask one last question. It's a more procedural question. I'm going to what you mentioned a bit ago when you were referring to the disclaimers being arguably misleading. I go with that occurrence. Isn't this case a candidate for discovery? And then again, you may ultimately prevail. There's no issue of the fact on a rule 56 motion. Isn't a 12B6 death knell too premature for that when you have arguably misleading statements? I think this is exactly the type of case that the PSLR rate was designed to deal with on a motion. I've been doing this for long enough that I remember what it was like before 1995, for better or worse. But for the past 27 years, these are the types of cases. And that's why you see Sarepta, you see Ocular, you see Rewalk, you see cases like this where the court says, this court, the First Circuit, including an Ocular, which I was in front of Judge Barron on just exactly two years ago today, I think. Yes, the statement may be misleading. It's left out. It should have been said that if it had been said, it would have been material. But the question of knowledge is a pleading standard under TELLABS. And sure, we can go into discovery and prove ourselves right. But that's millions and millions and millions of dollars and years. And these folks are being accused of fraud. And this case started as a very long case with many statements and many, many defendants being accused of fraud. And they've narrowed it down to two statements, which they did not have to do. They could have argued anything on appeal. Two statements and two defendants. And to make those folks and those statements go forward in discovery when they don't have the balance of the inferences under TELLABS would be unfair. Can I ask one last question, just actually referring to, I think, a line of questioning from Judge Barron, and that's the alleged separate scheme of withholding adverse event data from the FDA. The question would be, and as you know, opposing counsel asked this in their reply brief, why doesn't that separate scheme give rise to an inference of Sienter as an extreme departure from the standard of care? Because there's no concept like that that's recognized in the securities laws, Your Honor. The notion that, and AbioMed's a good example. AbioMed, there's this whole notion that there's this scheme to engage in off-label marketing, which is illegal and can subject a company to criminal prosecution. And the false statements in that case were tied to the off-label marketing. The notion was they're willing to off-label market, they must be willing to lie about their revenue because their revenue is coming from off-label marketing. And the court, this court, rejected that notion. And there are other similar cases like that that we cite in our brief. And to say that two years before these statements were made, the company was misleading the FDA, or willing to mislead the FDA, as you put it, with regard to the nature of the adverse events. Well, the FDA issued a 483. They issued a clinical hold. The company put together a list of adverse events that the FDA requested, gave them to the FDA, disclosed the 483, disclosed the hold, similar to Ocular. They're making negative statements out there in the they're certainly willing to do it when they feel like it's necessary. Assuming that because the company is arguing with their employees over what is or is not a related adverse event means that they are intentionally understanding that their statements would mislead the market. There's no support in the securities law under the PSLRA for that type of notion. But one last actual point. At the time that we know of the number of adverse events that ultimately occurred in this STORM study, which is like what, 370 or something like that, that makes those, that's being used as the reason to think the statement's false and misleading. As of that time, how many of them were known to the FDA? Does the record show us anything about that? All of them, only some of them? Absolutely, your honor, because the entire basis for this case as it stands here today, a case with no insider trading, no allegations, motive, whatever, is the ODAC briefing book. So everything that you see about the adverse events in the STORM 2B trial come from the briefing document that the FDA submits. I'm sure the court understands this, but just the level set. When there's an ODAC meeting convened, the FDA and the sponsor both submit briefing books to ODAC, this independent panel, 13 people, to consider these briefing documents. And it's from the FDA's briefing document that the plaintiff pulls the adverse event information that lands in the complaint. And I say again, that ODAC panel, 8 to 5, delay or approve now. No rejection, delay or approve. That's a scientific disagreement. That's not fraud. Thank you. Okay, thank you. Thank you. Thank you very much. Thank you, Attorney Bongiorno. At this time, if you could please mute your audio and your video. And Attorney Apton, please reintroduce yourself on the record to begin. Three minutes. Yes, Adam Apton for Plaintiff Appellant. If I may, counsel mentioned the risk factors as well as the ocular therapeutics case, Genzyme and some others that stand for the proposition, which Judge Gordon followed. Folsom disclosures are not indicative of a company bent on misleading investors. If we look at the disclosures, the risk warnings in this case, it's very clear that they're different than the ones in, for example, ocular therapeutics or Genzyme. Take, for example, the one counsel referenced in the annual report for 2017, dated March of 2018, so just a few weeks before the misrepresentation is an issue. The risk warnings that counsel said were Folsom and on par with ocular therapeutics, for instance, state, quote, a small percentage of patients across our clinical trials have experienced serious adverse events. That's what they're disclosing in March of 18. We know that in the STORM trial, the pivotal trial for the Selenix or NDA, 60% of patients had suffered serious adverse events. That is not a small percentage of patients. So even the risk warnings here that counsel relies on and that seemingly influenced Judge Gordon are arguably misleading. I would also point out that they were not made in real time during the class period as events unfolded. And so for those reasons, and also to include that the ultimate truth here was not disclosed voluntarily by the company, but rather by the ODAC report. So the disclosures that Judge Gordon believed undercut the inference of Santer and made this case like ocular therapeutics and Genzyme are not the same. Just so I get the timing, what is the relationship between the ODAC report being made public and the statements? ODAC report was made public in February of 19. The statements were in April and May of 18. And you agree though that ODAC would have had the time the statement was made? No, I wouldn't because the NDA wasn't filed with the FDA until I believe it was August of 18. So a few months after the studies had been completed. At the time the statements were made, we don't know whether FDA knows of the total number of adverse events that are ultimately set forth to the FDA in the briefing book. Right. I don't know. I don't know what the FDA knew at what points in time. We don't know that. We don't know that they don't know at that point either, or do we from your allegations? No. All we know is that in March of 17, the FDA caught wind of unreported adverse events. And we know if plaintiff's allegations are to be accepted as true that the NDA ultimately filed with the FDA also omitted additional adverse event data based on FE4 and FE3. So a lot has been said about Selenoxor obtaining approval again, for a different patient indication after a major amendment. But also if plaintiff's allegations are to be accepted as true, it was granted approval based on an incomplete NDA, one that omitted additional safety information. So presumably or plausibly, if all that adverse event information had been given to the FDA, as it should have been, it's very likely that Selenoxor would never have been approved. The last point I would make, your honors, is just... Well, I guess I just want to thank you all for your time and attention to this case. Thank you. That concludes the argument for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you should disconnect from the meeting.